Alan KASTENDIECK, Appellant,

v.

## MILLERS MUTUAL INSURANCE COMPANY OF ALTON, ILLINOIS, Respondent.

No. WD52491.

Missouri Court of Appeals,
Western District.

June 3, 1997.

Donald V. Nangle, St. Louis, for appellant.

Michael B. Maguire, T. Michael Ward, Brown & James, St. Louis, for respondent.

Before HANNA, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

ELLIS, Judge.

On January 28, 1993, Alan Kastendieck's residence and all personal property contained therein were destroyed by fire.[1] At the time, a valid homeowner's insurance policy issued by Millers Mutual Insurance Company of Alton, Illinois ("Millers") was in effect. The policy's declarations page reflected policy limits of $89,500 on the dwelling and $44,750 on the contents. The policy also contained replacement cost endorsements (HO–290 and HO–291), pursuant to which Millers agreed upon stated conditions to replace or repair the house and its contents.

On February 1, 1993, Kastendieck met with Millers claims representative, John Blocher, to give a recorded statement. At that time, Kastendieck indicated that he was unsure whether he was going to rebuild his house. On April 20, 1993, Millers paid Kastendieck $90,000 for the loss of his dwelling.[2]

---

1. The damage to the dwelling and personal property was determined to be a total loss.

2. This sum includes payment of the $89,500 policy limits and a $500 inflation calculation.

According to Millers, the home's depreciated value was $85,800 (the estimated cost of repair, $133,695, minus depreciation). Millers also retained a real estate appraiser who placed a reasonable market value of $87,000 on the home. Because these sums were less than the stated policy limit on the dwelling, $89,500, Millers paid Kastendieck the policy limit as required by § 379.140.[3] Millers also paid Kastendieck $45,000 for his personal property loss.

On March 4, 1993, Kastendieck secured the services of a public adjuster. Through his public adjuster, Kastendieck submitted to Millers a proof of loss reflecting an actual cash value of $181,643.51 for his home and $66,475.09 for his personal property. On June 25, 1993, Kastendieck's public adjuster made written demand for the unpaid balance of $91,643.51 on the home and $36,092.59 on the contents ($81,092.59 minus the $45,000 payment).[4] Pursuant to a November 23, 1993 letter, Millers rejected Kastendieck's claims on the grounds that:

> [n]o additional liability has been sustained by [Millers] ... under the [dwelling] replacement cost endorsement ... because actual repair or replacement has not been completed. In addition, you have not elected to replace the dwelling as evidenced by your decision to retire your mortgage debt, a lack of any action towards replacing and your failure to advise [Millers] of any intent to replace.
>
>    &ast;     &ast;     &ast;     &ast;     &ast;     &ast;
>
> [n]o additional liability has been sustained by [Millers] under [the personal property replacement endorsement] because actual

replacement has not been completed nor have the limits of coverage increased under [the dwelling endorsement] because you have not, at the present time, satisfied the conditions in that endorsement. Further, you have not provided properly identified receipts evidencing the replacement of the property so that a determination can be made as to any additional liability under the replacement cost endorsement should the limits eventually be increased.

Millers, however, did extend to Kastendieck a period of twenty additional days from receipt of the letter denying his claim in which to elect to replace the dwelling and make a claim for any additional liability on a replacement cost basis based on his deposition testimony that he "intended to rebuild" his dwelling.

Kastendieck did not take advantage of this option, instead he brought this action against Millers to recover the difference between the policy limits and the cost of replacing his dwelling and personal property. The case was tried to the court without a jury. At the close of Kastendieck's evidence Millers moved the court for judgment under Rule 73.01(a)(2), claiming Kastendieck was not entitled to relief because he had failed to produce any substantial evidence that he: (1) elected to repair or replace the residence, (2) submitted a replacement cost claim within 180 days, and (3) completed repair on the residence. The court sustained the motion and entered judgment in Millers' favor.[5] Kastendieck appeals.

In a bench-tried case, a motion to dismiss filed at the close of a plaintiff's case is treat-

---

3. Section 379.140 provides:
   In all suits brought upon policies of insurance against loss or damage by fire hereafter issued or renewed ... in the case of total loss of the property insured, the measure of damage shall be the amount for which the same was insured, less whatever depreciation in value, below the amount for which the property is insured, the property may have sustained between the time of issuing the policy and the time of the loss, and the burden of proving such depreciation shall be upon the defendant....

4. Kastendieck's public adjuster advised Millers that:
   ... Since "coverage C", represents 50% of coverage and the Actual Cash Value of "Cover-

age A" is increased $181,163.51, "coverage C" would increase to $90,821.76 of 50% of "coverage A". Since it is the insured's duty to determine depreciation on contents, we have submitted as actual cash value claim, the amount of $66,475.09. Since you have paid $45,000.00, on "coverage C" we request the additional $21,475.09 Actual Cash Value due. The insured will then be entitled to additional recovery of $14,617.50, which represents replacement cost of the contents, equalling $81,-092.59.

5. Because the court orally sustained the motion, we assume it was on the grounds asserted.

ed "as a submission on the merits, requiring the court to determine the credibility of the witness and to weigh the evidence." *Pasta House Co. v. Williams*, 833 S.W.2d 460, 461 (Mo.App. E.D.1992) (quoting *Wyrozynski v. Nichols*, 752 S.W.2d 433, 436–37 (Mo.App. E.D.1988)). Accordingly, we view the evidence in the light most favorable to the judgment. *Id.* Because neither party requested findings of fact or conclusions of law, we consider all fact issues to have been found in accordance with the result reached, and will affirm the judgment if it is correct on any reasonable theory supported by the evidence. *Molasky Enters., Inc. v. Carps, Inc.*, 615 S.W.2d 83, 86 (Mo.App. E.D.1981). We are mindful that "our primary concern is the correctness of the trial court's result, not the route taken to reach it." *Heartland Health Sys., Inc. v. Chamberlin*, 871 S.W.2d 8, 10 (Mo.App. W.D.1993). We will sustain the court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Patrick v. Koepke Const. Inc.*, 844 S.W.2d 508, 512 (Mo. App. E.D.1992).

Under Kastendieck's basic policy of insurance, recovery for property losses to buildings was capped at "the limit of liability under [the] policy that applies to the building," and losses to personal property were settled "at actual cash value at the time of loss but not more than the amount required to repair or replace." The dwelling replacement cost endorsement attached to his policy for an additional premium guaranteed unlimited replacement or repair cost protection on his dwelling:

... [W]e agree to amend the present coverage amounts indicated on the Declarations page in accordance with the following provisions:

1. If you have:

a. allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

(1) the property evaluations we make; and

(2) any increases in inflation; and

b. notified us, within thirty (30) days of completion, of any alterations to the dwelling which increase the replacement cost of the dwelling by 5% or more; and

c. elected to repair or replace the damaged building;

We will:

a. increase the Coverage A limit of liability to equal the current replacement cost of the dwelling if the amount of loss to the dwelling is more than the limit of liability indicated on the Declarations page;

b. also increase by the same percentage applied to Coverage A the limits of liability for Coverage B, C and D. However, we will do this only if the Coverage A limit of liability is increased under paragraph a. above as a result of a Coverage A loss.

c. adjust the policy premium from the time of loss for the remainder of the policy term based on the increased limits of liability.

2. If you comply with the provisions of this endorsement and there is a loss to a building insured under Coverage A. Section I Condition 3. Loss Settlement, Section 3b. is deleted and replaced by new section 3b., c, and d as follows:

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts for equivalent construction and use on the same premises:

(1) the replacement cost of the building or any parts of it;

(2) the amount actually and necessarily spent to repair or replace the building or any parts of it;

(3) the applicable limit of liability whether increased or not, adjusted in accordance with paragraph 1. above.

c. We will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

d. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within one

hundred eighty (180) days after loss for any additional liability on a replacement cost basis.

The personal property replacement cost endorsement guaranteed Kastendieck replacement or repair cost protection on his personal property. The endorsement defines "replacement cost" as:

2. REPLACEMENT COST

a. We will pay no more than the least of the following amounts:

(1) replacement cost at the time of loss without deduction for deprecation;

(2) the full cost of repair at the time of loss;

(3) the Limit of Liability that applies to Coverage C; or

(4) any special Limit of Liability stated in this policy.

b. When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

c. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional Liability in accordance with this endorsement.

As a general rule, a person is bound by the terms of the contract signed. *Heartland,* 871 S.W.2d at 10. An exception to this rule exists, however, where the contract is one of adhesion containing some ambiguity in the policy language. *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d 379, 382 (Mo. banc 1991).[6] In such cases, the court will construe the contract according to the "reasonable expectations" of the party, provided the party's expectations are objectively reasonable and that of the average person. *Sanders v. Wallace,* 884 S.W.2d 300, 305 (Mo.App. E.D.1994).[7]

Although a contract for insurance is considered a contract of adhesion, *Farm Bureau Mut. Ins. Co. v. Broadie,* 558 S.W.2d 751, 755 (Mo.App. S.D.1977), the application of the "reasonable expectations" doctrine depends on the presence of an ambiguity in the policy language. *Rodriguez,* 808 S.W.2d at 382. An ambiguity exists where there is duplicity, uncertainty or indistinctness in the meaning of the words used. *Id.* "The language of an insurance policy is ambiguous when it is reasonably and fairly open to different constructions." *Krombach v. Mayflower Ins. Co.,* 785 S.W.2d 728, 731 (Mo.App. E.D.1990). Similarly, language which promises something in one point and takes it away in another is ambiguous. *Maxon v. Farmers Ins. Co.,* 791 S.W.2d 437, 438 (Mo.App. W.D. 1990).

When determining whether the language used in the policy is ambiguous, we test the words in light of the meaning which would normally be understood by the layperson who bought and paid for the policy. *American Family Mut. Ins. Co. v. Turner,* 824 S.W.2d 19, 21 (Mo.App. E.D.1991). Where a conflict between a technical definition and the meaning which would reasonably be understood by the average layperson arises, we will apply the layperson's definition unless it is obvious the technical meaning was intended. *Krombach,* 785 S.W.2d at 731. An ambiguous phrase will be interpreted by reading the policy as a whole with reference to associated words. *Id.* Any ambiguity or doubt as to meaning will be construed to furnish coverage to the insured, rather than defeat coverage. *Turner,* 824 S.W.2d at 21.

Kastendieck contends the policy is an adhesion contract and requests that this court adopt the reasonable expectations rule of construction in interpreting the replacement cost endorsements. However, Kastendieck failed to plead any ambiguities in the

---

6. A contract of adhesion is one written in boilerplate language, prepared by the stronger party and sold to the weaker party on a take it or leave it basis. *Robin v. Blue Cross Hosp. Serv., Inc.,* 637 S.W.2d 695, 697 (Mo. banc 1982). Its terms "unexpectedly or unconsciously limit the obligations and liability of the drafting party." *Id.*

7. The reasonableness of the party's expectations are determined according to an objective standard and may or may not be what the party actually expected. *Heartland,* 871 S.W.2d at 11.

policy language, nor were any identified at trial. An unambiguous policy will be enforced as written, absent a statute or public policy requiring coverage. *Peters v. Employers Mut. Casualty Co.*, 853 S.W.2d 300, 302 (Mo. banc 1993). According to the plain and unambiguous terms of the replacement cost endorsements, recovery of replacement cost is dependent upon a condition precedent, that being *actual repair or replacement.*

■ To the extent Kastendieck understood these endorsements to provide for the replacement of his dwelling and personal property without regard to the policy limit on the face of the policy, we find his expectations to be justified. However, Kastendieck's claim that he is entitled to recover the replacement cost of his dwelling and personal property without actually replacing these items must fail. The endorsements provide that Millers "will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete." This provision is clear and unambiguous and must be enforced as written. *Rodriguez*, 808 S.W.2d at 382. While we may feel another construction would more accurately reflect what most consumers reasonably anticipate they will receive when purchasing an option identified as "replacement cost," such assumption cannot create an ambiguity where none exists in the language of the policy. *Id.* The application of these endorsements is clearly restricted to situations where the damaged property is actually repaired or replaced. It is undisputed that Kastendieck has not repaired or replaced his dwelling, nor has he filed a proof of loss showing replacement of personal property at a cost greater than the amount already paid by Millers. The trial court did not err in entering judgment in favor of Millers.

The judgment is affirmed.

All concur.