Douglas DIBBEN and Deborah Dibben, Appellants,

v.

SHELTER INSURANCE COMPANY, Respondent.

No. WD 68269.

Missouri Court of Appeals, Western District.

May 6, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 2008.

Application for Transfer Denied Sept. 30, 2008.

Douglas Patterson and Michelle Lynn Webb Burns, Overland Park, KS, for appellant.

John Lavelle Mullen, Casey Symonds and Nicki Cannizero, Kansas City, Mo., for respondent.

PAUL M. SPINDEN, Presiding Judge.

Douglas and Deborah Dibben appeal the circuit court's summary judgment for Shelter Insurance Company in the Dibbens' lawsuit for breach of contract. The Dibbens charged Shelter with breaching its insurance policy issued during 2000 to insure the Dibbens' residential house near Freeman. The Dibbens averred that, when fire destroyed their house during June 2001, Shelter wrongfully insisted on paying only $164,100, the amount of insurance set out on the policy's declaration page, instead of paying $205,000, the claimed amount of the house's replacement cost. The Dibbens sued for $40,900, the difference between the house's claimed replacement cost and the amount that Shelter paid. Shelter moved for partial summary judgment, which the circuit court granted.

■ Before considering the merits of the Dibbens' claim on appeal, we determine our jurisdiction. Jurisdiction is an issue because the circuit court granted what it denominated a partial summary judgment. The circuit court did issue a subsequent judgment in which it stated that its prior judgment had "rendered any remaining claims moot and that there are no other pending claims," but it did not certify the judgment for appeal as required by Rule 74.01(b).

■ According to well-established law, a party may appeal only a final judgment—that is, a judgment that disposes of all claims and leaves nothing for further determination. *Penn–America Insurance Company v. The Bar, Inc.*, 201 S.W.3d 91, 95 (Mo.App.2006). Partial summary judgment is not a final judgment subject to our review because it leaves issues for further determination. *Id.* Hence, the issue is whether or not the circuit court issued a final judgment in this case.

Although the circuit court denominated its judgment as "Judgment Granting Partial Summary Judgment," the decree disposed of the only claim that the Dibbens asserted in their petition: that the Dibbens were entitled to the difference between the amount it cost to replace their house and the amount Shelter paid out. Because the circuit court's judgment resolved all issues and left nothing for further determination, it is a final judgment.

■ The Dibbens challenged the judgment on the ground that, because Shelter's policy was ambiguous, the circuit court should have construed the contract in their favor. They complain that, although the policy limited Shelter's liability to the amounts stated in the policy, the "replacement cost" section entitled them to "full replacement cost" regardless of the limitation set out on the policy's declaration page.

Our review of the circuit court's summary judgment is essentially *de novo*. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper only if the parties are not disputing any issue of material fact and if the party seeking summary judgment is entitled to judgment as a matter of law. Rule 74.04(c)(6); *ITT Commercial Finance*, 854 S.W.2d at 378. In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmoving party and afford this party the benefit of all reasonable inferences. *ITT Commercial Finance*, 854 S.W.2d at 382. "The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." *Id.* at 380.

■ The parties do not dispute any material factual issues. Their dispute focuses on the correct interpretation of the insurance contract. Interpretation of an insurance contract is an issue of law, which we review *de novo*. *Missouri Employers Mutual Insurance Company v. Nichols*, 149 S.W.3d 617, 625 (Mo.App.2004).

■ In interpreting an insurance contract, we read it as a whole to determine the parties' intent. *Id.* We give effect to this intent by enforcing the contract as written, according to the plain and ordinary meaning of its language. *Id.* In interpreting an insurance contract, we must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant. *Wildflower Community Association, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo.App.2000).

■ A contract is ambiguous when it is duplicitous, indistinct, or uncertain, leaving its interpretation open to differing reasonable constructions. *Krombach v. Mayflower Insurance Company*, 827 S.W.2d 208, 210 (Mo. banc 1992). When an insurance contract's language is ambiguous, we apply a meaning according to what the insured ordinarily would have understood, and, because the insurer typically is responsible for the ambiguity, we construe ambiguous provisions against the insurer. *Id.*

The Dibbens sought reimbursement for their destroyed house under the replacement cost section of the policy. It said:

Under Coverage A—Dwelling and Coverage B—Other Structures:

(1) How a loss to the dwelling or other structure will be settled will depend on how the amount of insurance relates to the full replacement cost.

(2) If, at the time of loss, *the amount of insurance* for the dwelling or other structure in this policy is 80% or more of the full replacement cost, **we** will pay the full cost to repair or replace the damaged part of the dwelling or other structure, without deduction for depreciation.

(3) If, at the time of loss, the amount of insurance for the dwelling or other structure in this policy is less than 80% of the full replacement cost, **we** will pay the larger of the following amounts:

  (i) the actual cash value of the damaged part of the dwelling or other structure; or

  (ii) the full cost to repair or replace the damaged property multiplied by the ratio of the amount of insurance on the dwelling or other structure to 80% of its full replacement cost.

(4) But, **we** will pay under (2) or (3) no more than the smallest of the following:

  (i) the *limit of liability* in this policy for the dwelling or other structure;

  (ii) the cost to replace the damaged dwelling or other structure with equivalent construction for equivalent use on the same premises;

  (iii) the amount actually spent for necessary repair or replacement of the damaged dwelling or other structure.[1]

The parties agree that the Dibbens correctly sought recovery under Section 2. The plain and ordinary language of Section 2 required Shelter to pay the full cost to replace the Dibbens' house if the amount of insurance was 80 percent of the house's

---

1. Bolded words were bolded in the original. We italicized the italicized words for emphasis.

full replacement cost. The Dibbens rely on this section to contend that they are entitled to the full replacement cost of $205,000. Shelter concedes that the full replacement cost for the house was $205,000,[2] but it maintains that Section 4 capped its liability. Shelter claims that Section 4 limited its liability to the least of three amounts: the limit of liability as set out on the declaration page, or $164,100, as reflected in subsection (i); the replacement cost of like construction on the same premises, as reflected in subsection (ii); and the amount actually spent to repair or replace the damaged dwelling, as reflected in subsection (iii). The insurance contract did not define "amount of insurance" or "limit of liability." The failure to define these terms renders Section 2 and Section 4 of the policy inherently inconsistent.

█ Well-established law holds that, when a policy does not define a term, a court is free to give the term a reasonable construction. *Nichols,* 149 S.W.3d at 625. We look to a dictionary for assistance in understanding these terms. Because the dictionary definition of "amount" is "the total number or quantity," WEBSTER'S NEW THIRD INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 72 (1993), we understand "amount of insurance" to mean the total value for which the Dibbens' house was insured under the policy, or $164,100. Because the dictionary definition of "limit" is "a prescribed maximum or minimum amount, quantity or number," *id.* at 1312, and "liability" is "[a] financial or pecuniary obligation," BLACK'S LAW DICTIONARY 932 (8th ed.1999), we understand "limit of liability" to be the greatest amount that Shelter could be obligated for under the insurance contract. Unclear, however, is whether this amount means the amount on the declaration page, which

is $164,100, or the replacement cost to which Section 2 refers. If, as the Dibbens argue, Section 2 overrides the general limit on the declaration page, "limit of liability" would be the maximum obligation as calculated in Section 2. Both of these interpretations are equally plausible and render the insurance contract ambiguous.

If the term "limit of liability" means the amount that Shelter would owe under Section 2, it would mean that Section 4(i) limited Shelter's maximum liability to the full replacement cost. This interpretation, however, renders Section 4(ii) and (iii) superfluous because those provisions already limit Shelter's maximum liability to replacement cost.

Shelter argues that "limit of liability" means the limit on the declaration page, which is $164,100. Under this definition, "amount of insurance" and "limit of liability" are synonyms. This, however, renders Section 2 and 4 inherently inconsistent. Because Section 2 says that Shelter would pay full replacement costs if the amount of insurance were 80 percent of more of the full replacement costs and if "amount of insurance" is synonymous with limit of liability, Section 2 permits a policyholder to receive more than the amount set out on the declaration page. This would be true so long as the amount of insurance were within 80 percent of the full replacement cost. For example, under Section 2, the Dibbens' amount of insurance was $164,100, which was 80 percent of the full replacement cost of $205,000. Thus, a reasonable reading of this section is that the Dibbens were entitled to the full replacement cost of $205,000 even though they had contracted for coverage of only $164,100.

Section 4(i), however, limited liability. If Shelter is correct that the limit of liabili-

2. The parties agree that $205,000 was not the amount that the Dibbens spent in replacing their house, but Shelter does not contest the Dibbens' contention that this amount was the full replacement cost.

ty in Section 4(i) refers to the Section 164,100 limit on the declaration page this provision has the effect of erasing the benefit accorded by the plain language of Section 2. Shelter would have us read its policy as giving a benefit in one provision, but completely taking it away in another. Reading Section 4 according to Shelter's interpretation would render Section 2 as mere surplus with no application to any scenario.

This inconsistency is not unique to the Dibbens' situation. Because "amount of insurance" is synonymous with "limit of liability," no policyholder could ever exceed his amount of insurance to recover full replacement cost under Section 2 because Section 4 would always limit it to the limit of liability in the policy. As construed by the circuit court, Shelter, by using two terms to describe the same thing, worded its policy in a way that either rendered Shelter's obligation under Section 2 illusory or the limitation in Section 4(i) ineffective. The effect was that even a reasonably careful reader would not have discerned the illusion.

Shelter seeks to avoid this result by contending that Section 2 should be understood as Shelter's commitment to pay full replacement cost, but only if the replacement cost were within 80 percent of the amount of insurance—that is, so long as the cost of rebuilding the Dibbens' house was between $131,280 and $164,100. Even if this interpretation were reasonable, it would not help Shelter's position because it would mean that Section 2 was susceptible to two reasonable meanings with the result that provision should be construed against Shelter as the drafter. *Krombach*, 827 S.W.2d at 210. Moreover, Shelter's reading of Section 2 is untenable for two reasons. First and foremost, it is not what Section 2 says. For Shelter to be correct,

Section 2 would have had to be reworded: "If, at the time of loss, the replacement cost for the dwelling is 80 percent or more of the amount of insurance, we will pay the full cost to repair or to replace." Section 2 says just the opposite: "If, at the time of loss, *the amount of insurance* for the dwelling ... is 80% or more of the full replacement cost, **we** will pay the full cost to repair or replace the damaged part of the dwelling[.]" [3] Shelter's interpretation is crabbed and wholly inconsistent with our obligation to apply the plain and ordinary meaning of the policy's language. Second, Shelter's interpretation renders subsections 4(ii) and (iii) mere surplus, not serving any obvious purpose other than to reiterate Shelter's obligation under Section 2. Hence, we reject Shelter's proffered interpretation.

Because Section 2 and 4 are inherently inconsistent, the circuit court should have construed them against Shelter and in favor of the Dibbens. *Todd v. Missouri United School Insurance Council*, 223 S.W.3d 156, 163 (Mo. banc 2007) (inconsistent and irreconcilable provisions must be construed against the drafter). Construing the insurance contract against Shelter, we hold that, under Section 2, the Dibbens were entitled to full replacement cost and Section 4(i) limited Shelter's obligation to the amount calculated in Section 2 and not to the limits on the declaration page. The circuit court, therefore, erred in entering summary judgment for Shelter. We reverse the circuit court's judgment and remand for it to enter judgment for the Dibbens.

JAMES M. SMART, JR., Judge, and JOSEPH M. ELLIS, Judge, concur.

3. We added the italics. The policy bolded "we."