

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| DEREK WILSON AND JENNIFER WILSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Appellants, | |
| v. | |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | |
| Respondent. | |

**WD77396**

**OPINION FILED:  May 19, 2015**

**Appeal from the Circuit Court of Buchanan County, Missouri**
The Honorable Randall R. Jackson, Judge

Before Division Three:  Victor C. Howard, Presiding Judge, James E. Welsh, Judge and Gary D. Witt, Judge

## INTRODUCTION

Derek and Jennifer Wilson ("the Wilsons") purchased a "Gold Star" 100% replacement cost insurance policy (the "Policy") from American Family Mutual Insurance Company ("American Family") to insure their home, a historic farmhouse located in Buchanan County.  After a fire completely destroyed the home, American Family informed the Wilsons that it would pay the face amount of the policy of $419,000

for the coverage on the dwelling, an amount that was substantially less than all bids to rebuild the home following the fire.

The Wilsons filed suit in the Circuit Court of Buchanan County against American Family and its agent, Matt Thrasher ("Thrasher"),[1] alleging negligent misrepresentation and breach of contract. The jury found for the Wilsons on their breach of contract claim, but found in favor of American Family on the negligent misrepresentation claim. On the breach of contract claim, the jury assessed damages in the amount of $7,500. The Wilsons filed a motion for a new trial or, in the alternative, for additur. The trial court denied both motions. On appeal, the Wilsons argued, *inter alia*, that the trial court erred in denying their motion for a new trial because evidence established that the Policy was ambiguous as a matter of law.

Because the trial court's finding that the Policy was not ambiguous is erroneous, we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY[2]

In 2003, the Wilsons purchased a historic farmhouse located in Buchanan County. The farmhouse was believed to have been built in the 1880's. It was unique in many ways. It had three fireplaces, full dimensional log walls, three levels, eight-inch wooden baseboards, seventy-three windows and doors with transoms, eight-to-twelve-inch crown molding, numerous built-in bookshelves, a foundation made of three layers of brick and wooden plank floors, among other unique features.

---

[1]We refer to American Family and Thrasher collectively as American Family for ease of reference.
[2]We view the facts in the light most favorable to the jury's verdict. *Mansfield v. Horner*, 443 S.W.3d 627, 633 n.1 (Mo. App. W.D. 2014) (citation omitted).

After purchasing the home, Derek Wilson ("Derek")[3] met with Thrasher, his long-time friend and American Family insurance agent regarding obtaining homeowners insurance on the home. Thrasher directed Derek to a "Gold Star" 100% Replacement Cost[4] insurance policy offered by American Family. American Family requires its agents to use a computer program provided by the company called Xactware to estimate the total replacement costs of homes when selling a Gold Star 100% Replacement Cost insurance policy. Derek answered questions regarding the home as Thrasher entered information into the Xactware software. Based on the information put into the program, American Family estimated that the total cost to replace the Wilsons' home with "like materials and built with like quality" was $419,000.[5] At trial, John Bosman ("Bosman"), American Family's Director of Sales, testified that American Family expects clients to rely on its Xactware software estimate and does not encourage customers to obtain an appraisal or a second opinion on replacement costs when purchasing a policy. Thus, it was for this amount that Thrasher sold a "total cost replacement" policy to the Wilsons. No one

[3]Because the Wilsons share the same last name, we refer to Derek Wilson using his first name to distinguish him from his wife, Jennifer. No disrespect or familiarity is intended.

[4]Though the policy is labeled "Gold Star Special Deluxe Form," American Family witnesses Thrasher and Hutchinson each testified that the Gold Star Policy was labeled and marketed as a "100% replacement cost policy."

[5]Pursuant to the terms of the Policy at each renewal of the policy, American Family would "correct the amount of Coverage A and B" in accordance with the "Residential Building Cost Index" and the premium for the policy would be adjusted accordingly. It is unclear from the evidence if the Policy issued in 2003 used the amount of $419,000 and the Policy in question issued in 2010 used the same amount without adjustment or correction for inflation by American Family in the intervening policies or whether the original policy was for a lesser amount that was increased over time to the $419,000 listed in the Policy at issue. However, American Family agreed that from the issuance of the 2010 Policy up to the time of the loss, the inflationary adjustment would have increased the Policy amount to $421,000. A similar provision adjusted the amount applicable to the personal property coverage. That provision is not at issue herein.

3

suggested to the Wilsons that they may need to purchase a policy with higher limits nor did the Wilsons request such a policy.[6]

When the Xactware program calculated the replacement cost of the Wilsons' home to be $419,000, Derek did not question the number. He later testified, "I knew I had purchased the best policy they had to offer and was certain that I had 100 percent replacement cost on my structure." The Wilsons timely paid all of their premiums over the next eight years.

On July 6, 2011, a fire completely destroyed the Wilsons' home. The house and all of its contents, as well as the detached garage, were destroyed. Tim Hutchinson ("Hutchinson") was the American Family adjuster assigned to the case. Prior to receiving any bids, Hutchinson sent three checks to the Wilsons: one in the amount of $421,000 for the house,[7] one for $42,000 for the garage[8] and a third check for $315,900 for loss of personal property.[9] The Wilsons did not cash the checks because they were unsure what the amounts of the bids would be to actually replace the structures and contents. As of July 30, 2011, Hutchinson attempted to obtain estimates of the cost to rebuild the Wilsons' home. During this process he also contacted Thrasher and requested that he obtain an estimate from a local contractor because the contractors Hutchinson normally

---

[6]Bosman further testified that American Family had been using an outside consulting firm for the past two years to check American Family's estimates of replacement costs of homes which resulted in "an extraordinary number of conversations to more accurately reflect the proper replacement costs of many structures."

[7]This amount represented the $419,000 listed on the declarations page of the Policy plus the Policy's inflationary factor between the date the Policy was issued and the date of the loss.

[8]Coverage for the detached garage was calculated by American Family as ten percent of the dwelling's value despite there being no mention of the detached garage in the Policy or an amount assigned to it on the declarations page. Neither party challenges whether the detached garage was covered under the Policy or the amount paid by American Family for its replacement.

[9]In addition, pursuant to the Policy, American Family began paying the Wilsons $2,500 per month for living expenses while they were displaced from their home. The Wilsons were eligible to receive this living expense payment for a maximum of one year from the date of the fire.

used were unavailable. Thrasher contacted local builder Mark Powell ("Powell") who met with the Wilsons in early August regarding the rebuilding of their home.

On August 22, 2011, Powell sent an email to Thrasher stating that the cost to replace the Wilsons' home was over $650,000, excluding any demolition work. Shortly thereafter, he provided Thrasher and the Wilsons his actual estimate to totally replace the home which was $665,000. Upon receiving the forwarded email, Derek testified that he "wasn't really alarmed in any way. I knew I had a 100 percent replacement cost policy" so he continued working on getting the rebuilding process started.

The Wilsons then returned two of the checks to Thrasher: the house check for $421,000 and the garage check for $42,000 because together they totaled over $200,000 less than the contractor's estimate to rebuild their home and garage. On September 28, 2011, Hutchinson put a note in his file that he wanted to get a second bid to rebuild the Wilsons' home. At that same time, Hutchinson spoke with Derek and told him that he was looking into whether "anything could be done about changing the limits" of the Policy.

On October 11, 2011, Hutchinson noted receipt of the voided checks but directed they be re-issued to the Wilsons with an "unable-to-reform-policy letter." Between October and December, however, Hutchinson continued to negotiate with the Wilsons and it was not until December 15, 2011 that Hutchinson actually re-issued the same payment, this time sending one check totaling $463,210. The letter enclosing the payment stated that the check represented the policy limits, but also stated that their rights would be unaffected by cashing the check. The Wilsons cashed the check, paid off

5

the mortgage that they had on the home, but continued to negotiate with American Family over obtaining additional funds to rebuild their home under the Policy. As a result of these negotiations, for example, in May 2012, American Family issued the Wilsons an additional check in the amount of $15,165.72 for trees and landscaping.

After 365 days had elapsed from the date of the fire and the Wilsons' home had not yet been rebuilt, American Family notified the Wilsons that they had not complied with the Policy condition precedent of rebuilding within one year of the occurrence date. American Family then informed the Wilsons that, as a result, they were no longer eligible for monthly living expenses nor were they eligible for the additional coverage of 20% that was to be paid in the event the replacement cost was higher than their policy "limit."

The Wilsons filed suit against American Family in which they brought one count for negligent misrepresentation and one count for breach of contract. In December 2013, a jury trial took place in the Circuit Court of Buchanan County. The Wilsons presented evidence that they had purchased a "100% replacement cost" premiere policy yet American Family refused to pay the replacement cost. They presented evidence of various replacement cost estimates, all of which were significantly higher than the replacement cost that American Family's software determined and upon which it based the Policy. In addition to not getting the replacement cost, the Wilsons presented evidence that, alternatively, the Policy was to pay at least 120% of the Policy "limit" in the event that the "limit" of the Policy was not enough to cover replacement costs. They contended that if the "limit" was found to be $419,000, then 120% of that limit, or, $502,800, was due them under the Policy. They argued that the company purposely drew

6

out the negotiation process in order to nullify the supplementary coverage based on a one-year rebuilding deadline and that the 120% provision of the Policy was illusory.

American Family presented evidence that the Policy limit as stated on the declaration page was $419,000, regardless of the true cost of replacement. It argued that the Policy was only to pay "100% of the policy *limit*" despite being called a "100% replacement cost policy."

At the close of plaintiffs' evidence, both sides moved for a directed verdict, which the court denied. At the close of all evidence, both sides renewed their motions for directed verdict and again the court denied each of them. The jury found for American Family on the negligent misrepresentation claim but found for the Wilsons on the breach of contract claim. On the breach of contract claim, the jury awarded damages of $7,500.[10] This appeal follows.

Further facts are set forth below as necessary.

## RELEVANT POLICY PROVISIONS

The effective dates of the policy are 09-22-2010 to 07-21-2011, which includes the date of the loss. The relevant portions of the policy are as follows:

MISSOURI HOMEOWNERS POLICY GOLD STAR SPECIAL DELUXE FORM (ED 06/94) MO
DECLARATIONS PAGE

| SECTION I | LIMITS |
|---|---|
| DWELLING | $419,000 |
| PERSONAL PROPERTY | $314,300 |

---

[10]The parties speculate before this court that this amount reflects three months of the $2,500 monthly living expense allotment that was being paid pursuant to the policy. It is unclear how the jury arrived at this amount.

THIS POLICY INCLUDES INCREASED BUILDING LIMIT COVERAGE UP TO 120% OF THE DWELLING LIMIT SHOWN ABOVE, SUBJECT TO POLICY PROVISIONS

LATEST BUILDING COST INDEX IS 191

DEFINITIONS

**Limit** means the limit of liability that applies for the coverage.[11]

GOLD STAR HOMEOWNERS AMENDATORY ENDORSEMENT[12]
SUPPLEMENTARY COVERAGES - SECTION I

**Increased Building Limit Coverage.** We will settle covered losses to the dwelling under Coverage A – Dwelling and to detached garage(s)[13] under Dwelling Extension at replacement cost up to a maximum of 120% of the limit applying to the damaged building, subject to the following provisions:

a. You have insured your dwelling and detached garage(s) to a minimum of 100% of their replacement cost as estimated by our residential building cost guide.

b. [Condition not relevant to this matter]

c. You have paid any additional premium due for the increase in value.

The Increased Building Limit Coverage only applies to dwellings and detached garage(s) that are repaired or replaced after a covered loss. This

---

[11]This definition does not refer back to the declaration page or to any provision of the policy. While American Family points to the declaration page as the place we should look to find the "limit" of this Policy, it acknowledges that the declaration page lists the "limits" for the dwelling as $419,000 but argues that this amount was increased by the inflation protection terms of the policy to $421,000 between the issuance of the Policy and the date of loss.

[12]The form for this policy was placed into use by American Family in 1994 and the "Amendatory Endorsement" for this policy was put into use by American Family in 1999. The endorsement modifies some of the most basic and important terms of the Policy. American Family offers no explanation as to why it was still using both forms from the time the amendments were put into effect in 1999 to 2003 (when the Wilsons originally purchased their policy) and through 2010 when the Policy in question was issued rather than incorporating the amendments contained in the endorsement into the Policy itself, so as to remove some of the confusion as to the applicable terms of the Policy.

[13]Notably, coverage for the Wilsons' detached garage is not listed on the declaration page; rather, it stems from a part of the Policy addressing Dwelling Extensions. Thus, it is clear that the "limits" shown on the declaration page do not represent the entire amount of coverage provided for by the Policy.

coverage does not apply to dwellings or detached garage(s) under construction until completed and occupied.

CONDITIONS - SECTION I

**Loss Value Determination**:

**Buildings Which Have a Permanent Foundation and Roof Insured at 100% of Replacement Cost**.

Buildings insured at 100% of replacement cost will be settled at replacement cost, subject to the following:

**Replacement Cost.**

If at the time of the loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I applies, we will pay the cost to repair the damaged portion or to replace the damaged building, provided repairs to the damaged portion or replacement of the damaged building are completed but not exceeding the smallest of :

(a) the cost to replace the damaged building with like construction for similar use on the same premises;

(b) the amount actually and necessarily spent for repair of the damaged portion or replacement of the damaged building;

(c) 120% of the limit applying to the damaged building.

**Buildings Which Have a Permanent Foundation and Roof Insured for less than 100% of Replacement Cost.**

Buildings insured for less than 100% of replacement cost will be settled, subject to the following:

(1) **Replacement Cost.**

If at the time of the loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I does not apply, we will pay the cost to repair the damaged portion or to replace the damaged building, provided repairs to the damaged portion or

replacement of the damaged building are completed but not exceeding the smallest of :

(a) the cost to replace the damaged building with like construction for similar use on the same premises;

(b) the amount actually and necessarily spent for repair of the damaged portion or replacement of the damaged building;

(c) the limit applying to the damaged building.[14]

## ANALYSIS

The Wilsons bring three points of error. In their first point, the Wilsons argue that the trial court erred in finding that the Policy language was unambiguous and denying their motions for a directed verdict and for a new trial. In their second point, they argue error in the admission into evidence of the amount their Policy paid for the replacement of personal property. In their third point, they contend that the trial court erred in denying their motion for additur. Because we find for the Wilsons under Point I, we do not reach Points II and III.

## Standard of Review

We first review whether the Policy language was ambiguous as a matter of law because that determination guided the trial court's subsequent actions. The interpretation of an insurance policy is an issue of law, subject to *de novo* review. *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 553 (Mo. banc 2014) (citations omitted).

---

[14]By restricting the replacement cost coverage to the "smallest" of the amounts correlating to (a), (b) and (c), the prefaced "100% replacement cost" coverage becomes illusory. *See Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 557 (Mo. App. W.D. 2008).

10

The Wilsons argue that the trial court erred when it found that the Policy language was unambiguous and denied their motions for directed verdict and for a new trial. They contend that evidence from both sides proved that the Policy contained ambiguities as to the amount of coverage, which are to be resolved in favor of the insured. *Rice v. Shelter Mut. Ins. Co.*, 301 S.W.3d 43, 46 (Mo. banc 2009). The alleged ambiguity is whether the replacement cost due the Wilsons under the policy is (1) the "limit" set forth in the declaration page of the policy of $419,000, (2) American Family's computer estimate as to the replacement cost of the Wilsons' home after adding the inflationary factor, which would be $421,000, (3) 120% of one of the two figures in 1 and 2 above, or (4) the actual replacement cost of the home, which was between $570,000 and $725,000 as estimated by the expert witnesses.

**A. Whether the 100% Replacement Cost Policy Language is Ambiguous**

> In construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance. The general rule in interpreting insurance contracts is to give the language of the policy its plain meaning. If language in an insurance policy is ambiguous, the court resolves the ambiguity against the insurer-drafter. An ambiguity exists only when a phrase is reasonably open to different constructions.

> Absent an ambiguity, however, appellate courts do not resort to canons of construction. If the policy's language is unambiguous, it must be enforced as written. In addition, courts may not unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity where none exists. Definitions, exclusions, conditions, and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable.

11

*Allen*, 436 S.W.3d at 553-54 (citations and internal quotation marks omitted).

"When determining whether the language used in the policy is ambiguous, we test the words in light of the meaning which would normally be understood by the layperson who bought and paid for the policy." *Kastendieck v. Millers Mut. Ins. Co. of Alton, Ill.*, 946 S.W.2d 35, 39 (Mo. App. W.D. 1997) (citation omitted). "Where a conflict between a technical definition and the meaning which would reasonably be understood by the average layperson arises, we will apply the layperson's definition unless it is obvious the technical meaning was intended." *Id.* (citation omitted). "An ambiguous phrase will be interpreted by reading the policy as a whole with reference to associated words." *Id.* (citation omitted). "Any ambiguity or doubt as to the meaning will be construed to furnish coverage to the insured, rather than defeat coverage." *Id.*; *Todd v. Mo. United Sch. Ins. Council,* 223 S.W.3d 156, 163 (Mo. banc 2007) (inconsistent and irreconcilable provisions must be construed against the drafter).

"Language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." *Krombach v. Mayflower Ins. Co.,* 827 S.W.2d 208, 210 (Mo. banc 1992) (citation omitted). "When an insurance contract's language is ambiguous, we apply a meaning according to what the insured ordinarily would have understood, and, because the insurer typically is responsible for the ambiguity, we construe ambiguous provisions against the insurer." *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 557 (Mo. App. W.D. 2008).

12

The American Family Gold Star Policy, which was admitted into evidence, had a declaration page that contained, *inter alia*, limits on the dwelling of $419,000[15] and $314,300 on personal property. Various other coverages were listed under "Additional Options/Endorsements that Apply to Your Policy," the first of which was the "Gold Star Homeowners Amendatory Endorsement." This ten-page amendment was attached to the policy and by its terms superseded certain sections in the main policy. Following the list of additional coverages listed on the declaration page was also the following: THIS POLICY INCLUDES INCREASED BUILDING LIMIT COVERAGE UP TO 120% OF THE DWELLING LIMIT SHOWN ABOVE, SUBJECT TO POLICY PROVISIONS.

The portions of the Policy most relevant to the total loss of a home are the two sections that were deleted and replaced by the amendatory endorsement: the "Increased Building Replacement Coverage" and the "Loss Value Determination" sections, as reproduced *supra*.[16]

The crux of the issue is whether the "limit" is an actual replacement cost to be determined at the time of loss or is the $419,000 estimate, regardless of what the actual replacement costs are. The Wilsons argue that the "limit" of their policy is the replacement cost of their home since they bought a 100% replacement cost policy. They argue that the "replacement cost" is the actual amount needed to replace their home equal to one of the builder's bids. American Family, on the other hand, maintained at trial and

---

[15]As previously noted, this was adjusted to $421,000 due to the inflationary provision in the contract.

[16]Though irrelevant to our analysis of the policy language, Derek testified that he never knew about nor saw the amendment until after filing the lawsuit.

13

in its brief that the "limit" is its own estimated "replacement cost"[17] of $419,000 even though that amount is far less than the actual costs needed to "replace the structure in like kind and quality." Notably, however, when Hutchinson, the adjuster, was asked about the meaning of the above section, he replied as follows:

Q: What is it that you understand to be 100 percent of replacement cost?

A: What it would cost to replace the structure with like kind and quality.

**B. Policy Definitions of "Replacement Cost" and "Limit"**

The two key phrases or words at issue are "limit" and "replacement cost." "Limit" is defined in the Policy as "the limit of liability or amount of insurance that applies for the coverage." A definition that contains within it the word that it is defining is circular and unhelpful. *Albanna v. State Bd. of Registration for Healing Arts,* 293 S.W.3d 423, 430 (Mo. banc 2009) (definition stating that "unprofessional conduct" consists of conduct which is determined to be unprofessional or dishonorable is circular and amounts to the statement that unprofessional conduct constitutes unprofessional conduct). Similarly, this Policy's use of the word "limit" in its definition of the word "limit" is likewise circular, i.e., the limit means the limit. The definition of the term "limit" in the Policy makes no reference to the amount listed on the declaration page and makes no mention of the replacement cost of the home.

---

[17]At oral argument, counsel for American Family conceded that the phrase "Replacement Cost" as it appears throughout the policy has only one meaning which is what a reasonable insured would understand the phrase to mean, which is "the total cost to repair or replace the damaged structure with like kind/quality materials." Although the phrase is capitalized in some places in the policy and not in others, counsel agreed that there was no significance to this difference and it did not change the meaning of the phrase. Of note is that the definition provided by counsel for American Family is exactly the definition that the Wilsons argue should be applied in interpreting the Policy.

"Replacement cost" is not defined in the policy. "Well-established law holds that, when a policy does not define a term, a court is free to give the term a reasonable construction." *Dibben*, 261 S.W.3d at 557. Thus, we look to a dictionary for assistance in understanding any undefined terms. The dictionary definition of "replacement cost" is "the current cost of replacing a fixed asset with a new one of equal effectiveness." WEBSTER'S NEW THIRD INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1925 (1993). This definition is consistent with the Wilsons' arguments throughout these proceedings and American Family's concession at oral argument. Because the dictionary definition of "liability" is "an amount that is owed," the phrase "limit of liability" under this Policy should be read to mean the greatest amount that American Family owes under the insurance contract. WEBSTER'S NEW THIRD INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1302 (1993). *See Dibben*, 261 S.W.3d at 557 (construing "limit of liability" similarly).

Unclear, however, is whether the "limit" of liability is the amount listed on the declaration page, which is $419,000, or the replacement cost (current amount necessary to replace the dwelling with like kind and quality materials) to which the "Supplementary Coverages - Section I" refers:

> We will settle covered losses to the dwelling under Coverage A-Dwelling and to detached garage(s) under Dwelling Extension **at replacement cost** up to a maximum of 120% of the **limit** applying to the damaged building . . .

The "Conditions - Section I" puts it this way:

> Buildings insured at 100% of **replacement cost** will be settled at **replacement cost** . . .

15

If, as the Wilsons argue, these two sections describing "replacement cost" override the general limit on the declaration page, "limit of liability" would be the maximum obligation as calculated in these two sections. Both of these interpretations are equally plausible and render the insurance contract ambiguous. *See Dibben*, 261 S.W.3d at 557. Indeed, "[l]anguage is ambiguous if it is reasonably open to different constructions." *Krombach,* 827 S.W.2d at 210 (citation omitted).

American Family argued at trial that the Policy limit was $419,000 no matter what, as this was the "limit" listed on the declaration page. And yet, it agrees on appeal that the inflationary factor contained within the Policy increased this amount to $421,000 between the time the Policy was written and the time of the fire. American Family maintains, in the alternative, that the "limit" could be up to 120% of one of these two numbers, if certain conditions are met.

In *Dibben*, this court addressed a factually similar allegation regarding whether language in the "replacement cost" section entitled the insureds to the "full replacement cost" of their home regardless of the limitation set out on the policy's declaration page. 261 S.W.3d 555. After a fire destroyed the Dibbens' home, they sought payment for the "full replacement cost" pursuant to their policy. However, Shelter insisted on paying only $164,100, the amount of insurance set out on the policy's declaration page, instead of paying $205,000, the claimed amount of the house's replacement cost. *Id.* The Dibbens "complain[ed] that, although the policy limited Shelter's liability to the amounts

16

stated in the policy, the 'replacement cost' section entitled them to 'full replacement cost' regardless of the limitation set out on the policy's declaration page." *Id.*

The policy at issue in *Dibben* is markedly similar to the Wilsons' Policy. The Dibbens sought reimbursement for their destroyed house under the replacement cost section of the policy, which stated:

Under Coverage A—Dwelling and Coverage B—Other Structures:

(1) How a loss to the dwelling or other structure will be settled will depend on how the amount of insurance relates to the full replacement cost.

(2) <u>If, at the time of loss, *the amount of insurance* for the dwelling or other structure in this policy is 80% or more of the full replacement cost, **we** will pay the full cost to repair or replace the damaged part of the dwelling or other structure, without deduction for depreciation.</u>

(3) If, at the time of loss, the amount of insurance for the dwelling or other structure in this policy is less than 80% of the full replacement cost, **we** will pay the larger of the following amounts:

(i) the actual cash value of the damaged part of the dwelling or other structure; or

(ii) the full cost to repair or replace the damaged property multiplied by the ratio of the amount of insurance on the dwelling or other structure to 80% of its full replacement cost.

(4) <u>But, **we** will pay under (2) or (3) no more than the smallest of the following:</u>

(i) <u>the *limit of liability* in this policy for the dwelling or other structure;</u>

(ii) <u>the cost to replace the damaged dwelling or other structure with equivalent construction for equivalent use on the same premises;</u>

(iii) the amount actually spent for necessary repair or replacement of the damaged dwelling or other structure.

*Dibben*, 261 S.W.3d at 556 (underlining added for emphasis as distinguished from italics and bold in original).

Although Shelter had conceded that the replacement cost was $205,000, it maintained that Section 4 capped its liability. *Id.* at 557. We noted, however, that "the insurance contract did not define 'amount of insurance' or 'limit of liability'" and held that "[t]he failure to define these terms renders Section 2 and Section 4 of the policy inherently inconsistent." *Id.* We further held that while Shelter argued that "limit of liability" meant the limit on the declaration page (which is $164,100), under this definition "amount of insurance" and "limit of liability" become synonyms.

Similarly, here, American Family uses "limit" and "replacement cost" as synonyms, arguing that the "replacement cost" is the "limit" noted on the declaration page. However, "replacement cost" is undefined in the Policy[18] and the dictionary meaning is the "current cost to replace a fixed asset." The undefined term of "replacement cost" would easily be understood by a lay person purchasing this Policy to mean the actual cost to replace his home while American Family desires to construe "replacement cost" as just another word for "limit." However, as conceded at oral argument, the term "replacement cost" as used in the Policy means the actual cost to replace the structure at the time of the fire with like kind and quality materials. If the "limit" of the Policy is, in fact, the actual cost to replace the home, then this is exactly what the Wilsons have been arguing since this dispute arose.

---

[18]Although the trial transcript contains a reference to correspondence dated August 11, 2011 from American Family that contains a definition of "replacement cost," that definition is not contained in the Policy. The letter, dated one month after the fire, defines "replacement cost" as "the cost to repair the damaged item with an item of like kind and quality without deduction for depreciation." This letter is not contained in the record before us.

As we found in *Dibben*, the policy language at issue here is ambiguous as a matter of law.

## C. Policy Language Provides Replacement Cost, Then Retracts It

In addition to the ambiguity in terms, the Policy also grants coverage in one section and takes it away in another, just as the Shelter policy did in *Dibben*. "Ambiguous provisions of a policy designed to cut down, restrict, or limit insurance coverage already granted, or introducing exceptions or exemptions must be strictly construed against the insurer." *Krombach*, 827 S.W.2d at 210-11 (citations omitted). "This rule is especially applicable where insurance is first 'granted' and is then followed by provisions *limiting* or avoiding liability." *Rice*, 301 S.W.3d at 47 (citing *Versaw v. Versaw*, 202 S.W.3d 638, 643 (Mo. App. S.D. 2006)) (emphasis added). As we noted in *Dibben*:

> This, however, renders Section 2 and 4 inherently inconsistent. . . . Thus, a reasonable reading of this section is that the Dibbens were entitled to the full replacement cost of $205,000 even though they had contracted for coverage of only $164,100.

> Section 4(i), however, limited liability. If Shelter is correct that the limit of liability in Section 4(i) refers to the Section 164,100 limit on the declaration page this provision has the effect of erasing the benefit accorded by the plain language of Section 2. Shelter would have us read its policy as giving a benefit in one provision, but completely taking it away in another. Reading Section 4 according to Shelter's interpretation *would render Section 2 as mere surplus with no application to any scenario*.

> This inconsistency is not unique to the Dibbens' situation. *Because "amount of insurance" is synonymous with "limit of liability," no policyholder could ever exceed his amount of insurance to recover full replacement cost under Section 2 because Section 4 would always limit it to the limit of liability in the policy. As construed by the circuit court, Shelter, by using two terms to describe the same thing, worded its policy in a way*

19

*that either rendered Shelter's obligation under Section 2 illusory or the limitation in Section 4(i) ineffective. The effect was that even a reasonably careful reader would not have discerned the illusion.*

\* \* \*

Because Section[s] 2 and 4 are inherently inconsistent, the circuit court should have construed them against Shelter and in favor of the Dibbens. Construing the insurance contract against Shelter, we hold that, under Section 2, the Dibbens were entitled to full replacement cost and Section 4(i) limited Shelter's obligation to the amount calculated in Section 2 and not to the limits on the declaration page. The circuit court, therefore, erred in entering summary judgment for Shelter. We reverse the circuit court's judgment and remand for it to enter judgment for the Dibbens.

261 S.W.3d at 557-58 (emphases added; citation omitted).

The Policy language in the case at bar closely mirrors that of *Dibben* such that our analysis is consistent. First, we have nearly the same requirement regarding coverage: "You have insured your dwelling and detached garages to a minimum of 100% of their replacement cost as estimated by our residential building cost guide." (Although in *Dibben*, it was 80%).[19] The American Family residential cost guide told the Wilsons to insure for $419,000, so they insured at 100% of $419,000.

Second, under Loss Value Determination, we look to the applicable section titled "Buildings Which Have a Permanent Foundation and Roof Insured at 100% of Replacement Cost." Next, the Policy reads:

b. **Buildings Which Have a Permanent Foundation and Roof Insured at 100% of Replacement Cost**.[20]

---

[19]As we noted in *Dibben*, even this type of delineation is ambiguous because it can be interpreted as referring to 100% of the estimate given to the client at the time the policy was purchased or 100% of a number obtained in the future to represent current replacement costs at the time of the loss.

[20] Of note, this provision makes no reference to the "replacement cost" as determined by the computer program, but only refers to the term "replacement cost" which would be the actual cost to repair or replace the structure using like kind and quality materials.

20

Buildings insured at 100% of replacement cost **will be settled at replacement cost, subject to the following:**

(1) Replacement Cost.

If at the time of the loss, the Increased Building Limit Coverage as provided under the Supplementary Coverages - Section I applies, **we will pay the cost to repair the damaged portion or to replace the damaged building, provided repairs to the damaged portion or replacement of the damaged building are completed but not exceeding the smallest of:**

> (a) the **cost to replace** the damaged building with like construction for similar use on the same premises;

> (b) the amount actually and necessarily **spent for** repair of the damaged portion or **replacement** of the damaged building;

> (c) **120% of the limit** applying to the damaged building.[21]

Prior to *Dibben*, we analyzed "replacement cost" language similarly in *Kastendieck*. 946 S.W.2d 35. There, the insureds sought replacement costs pursuant to a supplementary replacement endorsement for which they paid an additional premium. *Id.* at 38. We found that "[t]o the extent Kastendieck understood these endorsements to provide for the replacement of his dwelling and personal property without regard to the policy limit on the face of the policy, we find his expectations to be justified." *Id.* at 40. We noted that "another construction would more accurately reflect what most consumers reasonably anticipate they will receive when purchasing an option identified as

---

[21]In the alternative to its argument that the limit of its liability under the Policy is the face amount or $419,000, American Family argues that its maximum liability under this section is equal to 120% of the face amount of the Policy. However, if (a) the definition of Replacement Cost is, as American Family's counsel stated at oral argument, the actual cost to repair or replace the damaged structure with like kind and like quality materials; (b) this section **only applies** if the building is **insured at** 100% of the Replacement Cost, and (c) the most the Policy will pay is the actual cost to repair or replace the structure, it would then become impossible for anyone to ever recover 120% of the limit when the limit is the actual cost needed to repair or replace the structure and the actual cost to repair or replace is the maximum recoverable under the policy. This 120% coverage provision in this policy is illusory as a matter of law.

21

'replacement cost.'" *Id.* (citation omitted). Kastendieck's claim ultimately failed, however, because he did not "plead any ambiguities in the policy language, nor were there any identified at trial" and because he was attempting to get the higher limits of liability with no intention of actually replacing his home. *Id.* at 39-40.

Similarly, in *McMillin v. American Family Insurance Co.*, when analyzing "Replacement Cost" language in an American Family policy, we noted that "the policy required American Family to pay the full cost to rebuild without regard to the policy limit." 950 S.W.2d 242 (Mo. App. W.D. 1997). In that case, however, the policy's mandate was deemed "irrelevant" because the cost to replace the policy owner's home was less than the amount listed on the declaration page. *Id.* at 249.

Here, the Policy language is ambiguous because "limit" and "replacement cost" are used synonymously, creating two different constructions. *See Dibben*, 261 S.W.3d at 557. As a matter of law, the trial court should have construed the Policy against American Family and instructed the jury that the Policy required American Family to pay the Wilsons a replacement cost that reflected the total current cost to replace their home with like kind and quality materials. The jury would then have been free to determine the actual replacement cost based upon the evidence presented to them by the parties.

Point I is granted as to the Wilsons' contention that the Policy language is ambiguous and the cause is reversed and remanded for a new trial. Based on our holding on this point, we are not required to reach the additional points presented.

22

## CONCLUSION

The judgment entered by the trial court is vacated. The Policy language referring to the limits of coverage and the replacement cost of the dwelling is held to be ambiguous as a matter of law. Ambiguous language is construed against the drafter; thus, the Wilsons are entitled to the full replacement cost of replacing their destroyed home. The cause is remanded for a new trial limited to a factual determination of the amount of the current replacement cost to rebuild the Wilsons' home in like kind and quality and with like materials and the amount of living expenses under the policy for the reasonable time of construction.

_____
Gary D. Witt, Judge

All concur.